948 P.2d 127

**STATE of Idaho, Plaintiff–Respondent,**

v.

**George Junior PORTER, Defendant–Appellant.**

Nos. 18894, 22095.

Supreme Court of Idaho,
Coeur d'Alene, October 1996 Term.

Aug. 27, 1997.
Rehearing Denied Dec. 12, 1997.

774

Siebe Law Offices, Moscow, for appellant. James E. Siebe argued, Moscow.

Alan G. Lance, Attorney General; Catherine O. Derden, Deputy Attorney General (argued), Boise, for respondent.

Substitute Opinion

The Court's Prior Opinion Dated February 4, 1997 is Hereby Withdrawn.

## ON REHEARING

TROUT, Chief Justice.

This is a first-degree murder case in which the defendant was accused of violently beating a woman who previously had been the defendant's girlfriend. This case is before us on the direct appeal, the denial of the post-conviction petition, and this Court's statutory obligation to review the imposition of the death penalty pursuant to I.C. § 19–2827. We affirm the defendant's conviction and sentence.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS

George Junior Porter (Porter) was convicted of the first degree murder of his former girlfriend, Teresa Jones (Jones). It was undisputed that Porter had been Jones' boyfriend until several weeks before her death and that another man, Dale Cooper (Cooper), had been Jones' boyfriend prior to the time that Jones began dating Porter. It also was agreed that both men, on previous occasions, had severely beaten Jones.

Since the latter part of October 1988, Porter and Jones had been living together at Jones' residence. On the morning of December 7, 1988, Jones' neighbor, Bonnie Funnemark (Funnemark), contacted the Kamiah Marshal's Office and reported that Porter had been beating Jones in Jones' and Funne-

mark's yards and that, in the course of the incident, Porter had broken Funnemark's storm window. The deputy marshal who was dispatched to the scene located Porter and Jones outside of a nearby church, approximately one hundred fifty yards from Jones' residence. The deputy marshal took Porter to the station and arrested him for misdemeanor battery. Porter, however, was released later that day.

On December 12, 1988, Jones contacted the Kamiah Marshal's Office to request that a marshal evict Porter from Jones' home. Pursuant to Jones' request, a deputy marshal took Porter to his brother's residence in Idaho County in the early morning of December 13. There was some dispute in the testimony at trial, but it appears that, at the time Porter was evicted from the victim's house, Porter left behind all of his belongings, including a guitar case.

According to testimony presented at trial, patrons and employees of a bar in Kamiah had seen Jones alive on December 21, 1988. Also on December 21, 1988, Laura Cooper observed a man matching Porter's description, wearing a white stocking cap and brown jacket, enter Jones' residence through a front window. Laura Cooper's sister lived across the street from Jones, and Laura Cooper had been babysitting her sister's children on December 21, 1988.

On the evening of December 26, 1988, Funnemark contacted the Kamiah Marshal's Office to report that she had not seen Jones for approximately one week and had not seen smoke from Jones' chimney for three or four days. Two deputy marshals entered Jones' residence and found her body on the bed, naked and covered with a sleeping bag. One of the deputy marshals testified that the victim had been beaten severely in the face and head, that her lower body also had been beaten, and that there was a mark and/or hole on her forehead. Officers from the Kamiah Marshal's Office and the Lewis County Sheriff's Office investigated Jones' residence and found blood on the bedroom floor, on the bedroom walls, on the bathroom floor, and in the bathroom basin. Additionally, they found several clumps of human hair

that was the same length and coloring as the victim's hair on the bedroom floor.

The pathologist who performed the autopsy testified that Jones died of multiple blunt trauma to the head. He also testified that his examination of the victim's skull revealed that the mark on her forehead was not a bullet wound but that he could not identify the cause of the mark. Additionally, he noted that there were between three and six areas on the victim's scalp, each approximately the size of a fifty-cent piece, where the hair appeared to have been pulled out in large clumps. The pathologist could not determine how long Jones had been dead. However, he estimated that as many as twenty-four hours had passed between infliction of the injuries that eventually caused the victim's death and her actual death. Law enforcement officials authorized cremation of her body several days after it was discovered.

Porter was arrested in June 1989, and the court appointed counsel to represent him. At the arraignment, Porter pled not guilty, and Porter's counsel requested that the court pull jurors from another district. Porter's counsel, however, never filed a motion for a change of venue. Also at the arraignment, Porter's counsel requested and was granted authorization to retain an investigator, consult a forensic pathologist, and take depositions of two out-of-state witnesses. The investigator obtained by Porter interviewed Cooper and was successful in getting Cooper to admit that he, rather than Porter, had murdered the victim. The State, nonetheless, continued to pursue the case against Porter.

Approximately three and one-half months before trial, the State moved for permission to join an assistant attorney general, as special counsel. Porter's counsel did not oppose the motion, and the district court granted the State's motion.

Approximately eleven days before trial, the State disclosed that it intended to call several of Porter's former girlfriends to testify that Porter had seriously beaten them, including pulling out clumps of their hair during the beatings. As an offer of proof, the State presented testimony of two law enforcement officers and an investigator for the Idaho Attorney General regarding whether, in their experience investigating domestic violence cases, they found the acts of hair pulling and pulling out of hair to be unusual. All three testified that they had never had occasion to investigate a battery by a man against a woman where the man deliberately pulled out the woman's hair. After hearing this testimony, the district court informed Porter's counsel that he should be prepared to meet the evidence regarding Porter's prior misconduct, although the court indicated that it was not prepared to exclude or include the evidence. At this point, Porter's counsel requested the assistance of a second attorney to aid him in investigating these prior bad acts. The district court denied the request but permitted Porter to hire another investigator.

A two-week jury trial was held during January 1990. Over objection by Porter's counsel, the State introduced evidence that Porter had battered prior girlfriends and that, in the course of those beatings, Porter had pulled handfuls of hair out of the women's heads. The district court concluded that the evidence regarding the hair pulling incidents was admissible because it demonstrated a signature. Also at trial, the State called Porter's investigator during the State's case in chief and impeached the investigator for his interviewing techniques. The jury ultimately found Porter guilty.

At sentencing, the district court found three statutory aggravating factors, additional nonstatutory aggravating circumstances, and several mitigating circumstances. After weighing the mitigating circumstances against each of the aggravating factors, the district court concluded that the death penalty was the "only way to accomplish justice" and that any lesser sentence would depreciate the seriousness of the offense. Thus, the district court imposed the death penalty.

After sentencing, Porter requested substitute counsel. Porter's original counsel withdrew, and the district court appointed another attorney who argued Porter's motion for new trial. After hearing oral arguments on the motion, the district court denied the mo-

tion for new trial. At the same hearing, Porter requested additional counsel to assist in preparing his post-conviction relief petition and appeal. The district court granted the request. Approximately three months later, however, Porter and his most recently appointed counsel requested that the district court dismiss the other attorney.

Porter filed his post-conviction relief petition, alleging that it was error for the judge not to consider certain mitigating evidence that Porter was presenting with his petition and that Porter should be allowed a new trial based upon the district court's refusal to instruct on lesser included offenses. Porter also alleged ineffective assistance of counsel at trial. The district court denied the post-conviction relief petition on all grounds.

## II.

### TRIAL ISSUES

#### A. Cremation of the Victim's Body

 The defendant contends that it was constitutional error and a destruction of relevant evidence for the State to allow the victim's body to be cremated several days after an autopsy had been performed but before the defense had been given an opportunity independently to examine the body. When determining whether a defendant's due process rights have been violated by the loss or destruction of allegedly exculpatory evidence, this Court considers three factors: (1) whether the evidence was material to the question of guilt or the degree of punishment; (2) whether the defendant was prejudiced by the loss or destruction of the evidence; and (3) whether the government was acting in good faith when it destroyed or lost the evidence. *California v. Trombetta,* 467 U.S. 479, 487, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413 (1984). In conducting this analysis, this Court engages in a case-by-case assessment of the fault of the government and the significance of the loss or destruction to the critical elements of the defendant's case. *United States v. Heiden,* 508 F.2d 898, 902 (9th Cir.1974).

Initially, we note that this Court has examined the three-part *Trombetta* analysis within a factual context that is identical to the pres-

ent case. *See Paradis v. State,* 110 Idaho 534, 540–42, 716 P.2d 1306, 1312–14 (1986). In *Paradis,* we concluded that the State did not err when it allowed the victim's body to be cremated two days after performance of the autopsy but before the defense had examined the body. *Id.* at 541, 716 P.2d at 1313. We reasoned that a more complete autopsy would not have produced evidence that someone else had killed the victim, and, therefore, any evidence discovered would not have been exculpatory, as it would not have related to the defendant's guilt or innocence. *Id.,* 716 P.2d at 1313. We additionally determined in *Paradis* that the government did not act in bad faith when it released the victim's body because I.C. § 19–4301C authorized the coroner to release the victim's body to her next of kin within twenty-four hours of death or discovery of the body. *Id.,* 716 P.2d at 1313.

Keeping *Paradis* in mind, we conclude that Porter also failed to satisfy the elements of the *Trombetta* balancing test. There was no indication of how the body could have been exculpatory, given that everyone admitted how she died and the real issue was who committed the offense. During oral argument, defense counsel argued that a determination that the victim was strangled, rather than beaten, might have been exculpatory because Porter did not have a history of strangling or attempting to strangle women. Additionally, such a determination may have impacted the admissibility of evidence of prior misconduct, as Porter's pattern of behavior may have been marginally inconsistent with the manner in which Jones was killed. However, there was no showing that cremation of the body actually prejudiced Porter, nor that the State authorized the cremation of the victim's body with a bad faith intent to destroy evidence. Thus, we find no due process violation.

#### B. Denial of the Request for a Second Attorney at Trial

 Porter asserts that the district court's refusal to appoint co-counsel to investigate witnesses' testimony regarding prior bad acts violated his right to due process.

When a defendant has been provided with an attorney at public expense, his request for additional counsel is committed to the district court's sound discretion. *State v. Pizzuto,* 119 Idaho 742, 775, 810 P.2d 680, 713 (1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 495 (1992), *overruled on other grounds by State v. Card,* 121 Idaho 425, 825 P.2d 1081 (1991). Thus, when reviewing a district court's denial of a second attorney, this Court will not disturb a district court's discretion, absent a showing of abuse. *Pizzuto,* 119 Idaho at 775, 810 P.2d at 713. In evaluating the process by which the district court reached its decision, this Court focuses on:

(1) whether the district court correctly perceived the issue as one of discretion; (2) whether the district court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the district court reached its decision by an exercise of reason.

*Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

There certainly is not a requirement of a second attorney in death penalty cases. Thus, the district court acted within its permitted discretion when it denied Porter's request for a second attorney, and we conclude that Porter's allegation of error is without merit. Furthermore, Porter requested a second attorney for the sole reason that he needed to investigate witnesses' testimony regarding prior bad acts. Because Porter was given a second investigator to assist him in investigating those witnesses' testimony, we believe that Porter has failed to demonstrate that he was denied due process.

Porter urges this Court to adopt the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, which provides for the assignment of two defense attorneys in cases where the death penalty is sought. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 2.1 (1989). We decline Porter's invitation to adopt these guidelines. However, we recognize that it may be prudent to have at least one defense counsel who is experienced in death penalty cases and that it also may be prudent to have a second attorney, if requested by the defendant, particularly when the State is represented by two attorneys.

## C. Admission of Prior Bad Acts

■ Porter challenges on appeal the district court's decision to allow evidence of uncharged misconduct to be presented to the jury. He argues that the testimony of his three former girlfriends does not reveal conduct that is sufficiently distinctive to establish a signature and, therefore, that the testimony did not comply with the admissibility requirements of I.R.E. 404(b). Additionally, he asserts that the prejudicial effect of the testimony outweighed any probative value that the evidence may have contained and that the evidence, thus, was inadmissible under I.R.E. 403.

At trial but before Porter's three former girlfriends testified, the State contended that the three women's testimony would demonstrate that Porter engaged in a pattern of behavior that was consistent with the manner in which Jones was killed. Thus, the State argued, the testimony was admissible pursuant to I.R.E. 404(b) as probative on the issue of the identity of Jones' killer. Specifically, the State asserted the following similarities:

(1) Porter was calm before and after the beatings;

(2) Porter tended to beat the women about the head and beat their heads on hard objects;

(3) Porter requested that the women clean the blood off themselves after the beatings;

(4) Porter intimidated the women in order to prevent them from telling other people about the beatings; and

(5) Porter pulled their hair, even pulling it out during the beatings.

The district court initially found that there was nothing unusual or unique about elements (1), (2), (3), and (4), but the court said that these elements, when combined with element (5), tended to establish a pattern of behavior. Nonetheless, the district court concluded that, if it found the women to be credible, it would permit the State to intro-

duce evidence of hair pulling but would not permit the women to testify to the specifics of elements (1), (2), (3), and (4) because these were "typical of a wife beating or a battery by a man upon a woman."

In order to determine each witness's credibility before she testified in front of the jury, the district court heard each woman testify outside the presence of the jury. Following this, the district court affirmed its earlier ruling, stating that it was "convinced that the methods that were used in the other crimes or bad acts are so very similar to those that are used in the crime charged that the similarity is probative of identity." The court then indicated that the probative value of the evidence outweighed the potential prejudicial impact but cautioned the State that the women's testimony must be limited to incidents in which hair pulling was involved. The court, however, permitted the State latitude in setting the background and the circumstances under which the beatings occurred and, thus, allowed testimony of similarities other than hair pulling, including:

(1) each woman's involvement with Porter at the time the beating(s) occurred;

(2) Porter's tendency to beat the women about the head;

(3) Porter's propensity to hold each woman's hair while beating her head; and

(4) the fact that it took virtually nothing to prompt the beatings.

The general tenets of evidence typically forbid the admission of a defendant's prior misconduct, if the evidence is offered to prove that the defendant possessed a particular character trait and that the defendant acted in conformity with that trait. I.R.E. 404(b); *State v. Moore*, 120 Idaho 743, 745, 819 P.2d 1143, 1145 (1991); *State v. Needs*, 99 Idaho 883, 892, 591 P.2d 130, 139 (1979). Evidence of such misconduct, however, may be admissible when relevant to a material and disputed issue regarding the crime charged, such as establishing a *modus operandi* in order to prove the identity of the defendant as the perpetrator of the crime

charged. I.R.E. 404(b); *State v. Hatton*, 95 Idaho 856, 864, 522 P.2d 64, 72 (1974). Even if evidence of prior misconduct is deemed relevant under the I.R.E. 404(b) analysis, it still may be excluded under I.R.E. 403, if the district court concludes that the prejudicial impact of the evidence substantially outweighs the probative value of the evidence. I.R.E. 403; *State v. Stuart*, 110 Idaho 163, 170, 715 P.2d 833, 840 (1985), *overruled on other grounds by State v. Tribe*, 123 Idaho 721, 852 P.2d 87 (1993). Thus, in order to determine the admissibility of evidence over an I.R.E. 404(b) objection, the court must engage in a two-tiered analysis by inquiring: (1) whether the evidence is relevant to a material issue other than character, guilt, or propensity and (2) whether the probative value substantially outweighs the prejudicial impact.[1] *Moore*, 120 Idaho at 745, 819 P.2d at 1145.

We exercise free review over the district court's determination of the testimony's relevance because relevancy is neither a factual issue nor a matter of judicial discretion. *See State v. Raudebaugh*, 124 Idaho 758, 864 P.2d 596 (1993). Evidence of prior misconduct is relevant on the issue of identity when the evidence demonstrates sufficiently similar, as well as distinctive, characteristics or patterns between the prior misconduct and the charged crime. Imwinkelried, UNCHARGED MISCONDUCT EVIDENCE §§ 3:11–12 (1996). *See also United States v. Powell*, 587 F.2d 443, 448 (9th Cir.1978). We recognize that, although the prior acts and the charged crime need not be identical, *State v. Abel*, 104 Idaho 865, 869, 664 P.2d 772, 776 (1983), the existence of many common details strongly tends to infer that the evidence of the prior acts is probative of identity. *State v. Martin*, 118 Idaho 334, 337, 796 P.2d 1007, 1010 (1990). However, even if there are numerous similarities between the uncharged misconduct and the charged crime, no inference of identity can arise if the similar characteristics, considered either singly or together,

---

1. Although it may appear that this Court previously examined the admissibility of evidence of prior misconduct under the abuse of discretion standard, in fact, this Court engages in the two-tiered analysis set forth in cases such as *Moore*, 120 Idaho at 745, 819 P.2d at 1145 and *State v. Nichols*, 124 Idaho 651, 654, 862 P.2d 343, 346 (Ct.App.1993).

are not unusual. *Powell,* 587 F.2d at 448; *State v. Nichols,* 124 Idaho 651, 655, 862 P.2d 343, 347 (Ct.App.1993).

■ The district court in the present case found the following similarities between Porter's prior misconduct and the crime charged:

(1) each woman had been involved with Porter at the time the beating(s) occurred;

(2) Porter tended to beat the women about the head;

(3) Porter had a propensity to hold each woman's hair while beating her head;

(4) Porter pulled the women's hair, even pulling it out during the beatings; and

(5) it took virtually nothing to prompt the beatings.

Although Porter does not take issue with the number of similarities the district court found, Porter argues that these similarities are not sufficiently unique or distinctive to establish a signature. He suggests that, in order for the evidence to be admissible, the similarities must be so unique as to point to Porter, and Porter alone, as the perpetrator of the crime. This Court has not followed such a standard in the past, *see Hatton,* 95 Idaho at 865, 522 P.2d at 73, and, moreover, we decline to adopt such a standard because it simply is too narrow. As we stated in *Hatton,* evidence of prior misconduct is admissible if it establishes a distinct, though not completely unique, method or pattern of behavior. *Id.* at 865, 522 P.2d at 73. After examining the testimony of the two law enforcement officers and the attorney general's investigator regarding their collective experiences investigating batteries and analyzing the three former girlfriends' testimony before the jury, we hold that the evidence of prior misconduct indeed was relevant to the issue of the identity of Jones' killer.

■ We next examine the second part of the two-tiered analysis, or the district court's balancing of the probative value of the evidence of prior misconduct against the danger of unfair prejudicial impact. *See* I.R.E. 403; *Stuart,* 110 Idaho at 170, 715 P.2d at 840. The district court exercises discretion when it weighs these opposing factors, and we will not disturb the district court's discretion, absent abuse. *Moore,* 120 Idaho at 745, 819

P.2d at 1145. Thus, we review the district court's determination under the three-part abuse of discretion inquiry set forth in *Sun Valley Shopping Center,* 119 Idaho at 94, 803 P.2d at 1000. We note at the outset, however, that the district court clearly perceived the issue as one of discretion, and our analysis, therefore, centers primarily on the second and third parts of the test.

After examining the three occasions during the pretrial and trial proceedings where the district court considered the admissibility of the evidence, we have concluded that the district court did not abuse its discretion. Several factors support our conclusion. First, prior to ruling on the admissibility of the evidence and allowing Porter's three former girlfriends to testify, the district court heard each of the three women's testimony outside the presence of the jury, thereby limiting any unfair prejudice. The district court also excluded evidence relating to the way in which Porter dealt with his three former girlfriends after he had beaten them, reasoning that the similarities were not sufficiently distinctive to form a *modus operandi.* Additionally, the district court limited the three women's testimony to incidents in which hair pulling was, at least, one of the factors and excluded testimony relating to other beatings that did not involve hair pulling. Thus, the district court clearly tailored its ruling in order to ensure that the testimony met the requirements of I.R.E. 403 and 404(b). Furthermore, we recognize that, at the pretrial hearing regarding the admissibility of this evidence, two law enforcement officers and one state investigator testified that, in their experience, it was unusual for the victim of a battery to lose as much hair as Jones had lost and that it was unusual for a man who was beating a woman to deliberately pull out the woman's hair. In light of this testimony and the district court's carefully constructed limitations, we are convinced that the district court did not abuse its discretion. Thus, we hold that Porter was not denied his right to due process when the district court admitted evidence at trial of Porter's prior misconduct.

## D. Calling Porter's Investigator During the State's Case in Chief

Porter claims that it was fundamental error for the district court to allow the State to call Porter's investigator as a witness during its case in chief because, Porter alleges, the State's primary purpose was to impeach the investigator. Porter further argues that this improperly allowed the prosecution, during its case in chief, to present evidence rebutting the evidence concerning Dale Cooper's confession, which the defense had planned to present during its case. Porter additionally contends that this forced him to take the stand and testify, which violated his right against self-incrimination.

Because Porter did not object to the investigator's testimony or to the impeachment, we can address this issue only if it constitutes fundamental error. *State v. Knowlton*, 123 Idaho 916, 918, 854 P.2d 259, 261 (1993). In the past, we have said that the principle of fundamental error does not apply to discretionary, evidentiary rulings. *See State v. Matteson*, 123 Idaho 622, 624, 851 P.2d 336, 338 (1993). We think, however, that this is more of a procedural matter than an evidentiary one, and, thus, we may consider whether this was fundamental error.

A district court has broad discretion in making the initial determination to admit or reject rebuttal evidence. *State v. Olsen*, 103 Idaho 278, 282, 647 P.2d 734, 738 (1982). When this Court reviews a district court's decision regarding the admissibility of rebuttal evidence to determine whether there was fundamental error, this Court applies the abuse of discretion standard set forth in *Sun Valley Shopping Center*, 119 Idaho at 94, 803 P.2d at 1000. A fundamental error is one that: (1) goes to the foundation or basis of a defendant's rights; (2) goes to the foundation of the case; or (3) takes from the defendant a right that was essential to the defendant's defense and that no court ought to permit the defendant to waive. *Knowlton*, 123 Idaho at 918, 854 P.2d at 261.

A review of the record does not reveal how the State's calling of Porter's investigator as a witness had any connection to Porter feeling compelled to testify. Although the call-ing of the investigator during the State's case in chief to some extent may have disadvantaged Porter in the presentation of his proof, we do not believe that this was prejudicial and certainly do not believe that this goes to the very heart of Porter's case. Therefore, we conclude that it was not fundamental error for the State to call Porter's investigator during its case in chief and hold that the district court did not abuse its discretion when it allowed the State to present rebuttal evidence.

## E. Prosecutorial Misconduct

Porter complains of gross prosecutorial misconduct that warrants a new trial. He specifically asserts that the lead prosecutor failed to disclose in a timely manner a report prepared by a witness who was an expert in interviewing techniques. Porter additionally contends that the lead prosecutor made three improper comments while examining witnesses and four improper comments during closing argument.

A conviction will be set aside for prosecutorial misconduct only when the conduct is sufficiently egregious to result in fundamental error. *State v. LaMere*, 103 Idaho 839, 844, 655 P.2d 46, 51 (1982). Prosecutorial misconduct rises to the level of fundamental error when it is "calculated to inflame the minds of jurors and arouse passion or prejudice against the defendant, or is so inflammatory that the jurors may be influenced to determine guilt on factors outside the evidence." *State v. Babb*, 125 Idaho 934, 942, 877 P.2d 905, 913 (1994).

With respect to the expert witness and report regarding interviewing techniques, the district court gave Porter's counsel the option to recall the State's expert if, after cross-examining the witness, counsel wanted further time to review the witness's report in order to conduct a more thorough cross-examination. Porter's counsel's initial cross-examination apparently was sufficiently thorough, as Porter's counsel did not recall the expert. Thus, we believe that the untimely disclosure of the report did not prejudice Porter and cannot support a claim of

fundamental error resulting from prosecutorial misconduct.

■ An examination of the lead prosecutor's allegedly erroneous remarks during examination of two witnesses reveals that they too are not sufficiently prejudicial to support Porter's claim of fundamental error. Because Porter's counsel objected when the lead prosecutor asked one of the State's expert witnesses about the trustworthiness of Dale Cooper's confession, the jury never heard the expert's response. We do not believe that the unanswered question, by itself, could have influenced the jury, nor do we believe that the lead prosecutor, in asking the question, intended to inflame the jury. *See Babb*, 125 Idaho at 942, 877 P.2d at 913. Consequently, this comment did not rise to the level of fundamental error.

■ Unprompted by the lead prosecutor, this same expert witness mentioned during his testimony that he had reviewed a polygraph test taken by Dale Cooper. Porter's counsel immediately objected and moved for a mistrial. The district court denied Porter's motion for a mistrial and instructed the jury that polygraphs are "not accepted in the scientific community as a reliable method of ascertaining the truth" and that the jury is "not to consider whether or not a polygraph was given or speculate as to what any results might have been." Because the prosecutor neither elicited nor expected the witness's comment regarding the polygraph, the testimony, though arguably prejudicial, cannot be considered prosecutorial misconduct. *See id.*, 877 P.2d at 913.

■ The third alleged error during examination of witnesses was the lead prosecutor's comment while cross-examining a defense witness that the witness was lying. The comment was improper, as a prosecutor should avoid expressing a personal belief as to the credibility of a witness unless the comment is based solely on inferences from evidence presented at trial. *State v. Garcia*, 100 Idaho 108, 110, 594 P.2d 146, 148 (1979). This comment, however, was not sufficiently prejudicial to warrant a new trial. *See State v. Smoot*, 99 Idaho 855, 861, 590 P.2d 1001, 1007 (1978). Given the weight of testimonial

and physical evidence introduced against Porter throughout the trial, particularly the persuasiveness of the testimony of Porter's former girlfriends, we believe the jury would have found Porter guilty, even if the prosecutor's improper comment would have been properly excluded. *Id.* at 861, 590 P.2d at 1007. *See also State v. LePage*, 102 Idaho 387, 396, 630 P.2d 674, 683, *cert. denied*, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981).

■ The alleged errors during closing argument also do not rise to the level of fundamental error. A prosecutor has considerable latitude in his argument and has the right to discuss the evidence and the inferences and deductions arising from the evidence. *LaMere*, 103 Idaho at 844, 655 P.2d at 51. Furthermore, in the closing argument, the prosecutor is entitled to argue all reasonable inferences from the evidence in the record. *Garcia*, 100 Idaho at 110, 594 P.2d at 148 (citing ABA Standards Relating To Prosecution Function § 5.8 (1971)). Here, the prosecutor simply argued the facts and, contrary to Porter's allegations, did not express a personal belief.

With respect to each of Porter's alleged claims of prosecutorial misconduct, the prosecutor does not appear to have intended to inflame the minds of the jurors or to arouse passion or prejudice against Porter, as required under our decision in *LaMere*, 103 Idaho at 844, 655 P.2d at 51. Additionally, the alleged acts of misconduct were not so inflammatory that the jurors might have been influenced to determine Porter's guilt on factors outside the evidence. *See Smoot*, 99 Idaho at 861, 590 P.2d at 1007. Thus, Porter's allegations of prosecutorial misconduct, even if correct, are not so egregious as to constitute fundamental error and cannot support his request for a new trial.

## F. Sufficiency of the Evidence To Support the Verdict

■ Porter argues that there was insufficient evidence to support a conviction of first degree torture murder because the pathologist who performed the autopsy on the victim testified that the victim could have been rendered unconscious by the initial blow. Thus,

Porter appears to argue, Jones could not have died as a result of "extreme and prolonged acts of brutality," as the statutory definition of torture requires. *See* I.C. § 18–4001. Porter, therefore, requests that this Court review the entire record to determine whether there was sufficient evidence to support his conviction.

▇▇▇▇ When reviewing an allegation of insufficient evidence to support a conviction, this Court must determine whether there is competent evidence to sustain the verdict. *State v. Filson,* 101 Idaho 381, 386, 613 P.2d 938, 943 (1980). This Court simply reviews the evidence presented at trial and will not reweigh the evidence. *Id.* at 386, 613 P.2d at 943. We believe that Porter is asking us to reweigh the evidence, which we decline to do. Moreover, we are inclined to believe that there was sufficient evidence to support a guilty verdict. The State presented evidence that the victim's entire body had been severely beaten, with multiple trauma to the head, bruises too numerous to count, subdural hemorrhaging, ventricular hemorrhaging, lacerations on the lips and chin, and several areas of the scalp where hair had been broken off. Consequently, the condition of the victim's body appears to support a murder by torture jury instruction.

▇▇▇ Although Porter presented evidence tending to exculpate him from Jones' murder, including Dale Cooper's confession and related corroborating testimony, this Court will not reweigh the evidence. See *id.,* 613 P.2d at 943. The State presented sufficient evidence to persuade the jury to convict Porter, including evidence of Porter's physical abuse of Jones and other women with whom he had been romantically involved, testimonial evidence placing Porter and Jones together on the night of her murder, and physical evidence tending to place Porter in Jones' residence when she was killed. Thus, we conclude that there was sufficient evidence to support a first degree murder by torture charge and subsequent conviction, despite the existence of conflicting evidence.

### G. Lesser Included Offense Instruction

▇▇▇ A district court must instruct the jury on lesser included offenses if "[e]ither

party requests such instruction ... *and ...* [t]here is a reasonable view of the evidence presented in the case that would support a finding that the defendant committed such lesser included offense but did not commit the greater offense." I.C. § 19–2132(b) (emphasis added). Pursuant to the 1988 amendments to this statute, a defendant has an obligation to request a jury instruction on lesser included offenses. *State v. Tribe,* 123 Idaho 721, 726, 852 P.2d 87, 92 (1993). Thus, a district court does not have a duty *sua sponte* to instruct the jury on a lesser included offense. *State v. Eastman,* 122 Idaho 87, 90, 831 P.2d 555, 558 (1992).

▇▇▇ As the district court noted at the post-conviction relief proceeding, neither Porter nor the State requested an instruction on second degree torture murder. Consequently, the district court could not have erred when it failed to give such an instruction.

### III.

### SENTENCING ISSUES

### A. Consideration of Prior Bad Acts

▇▇▇ Porter contends that the district court erred during the sentencing proceeding when the court took judicial notice of the testimony given at trial by three of Porter's former girlfriends. Porter correctly notes that hearsay cannot be introduced at a formal sentencing hearing. *See* I.C.R. 32(e)(1); *State v. Charboneau,* 116 Idaho 129, 148–49, 774 P.2d 299, 318–19, *cert. denied,* 493 U.S. 922, 110 S.Ct. 287, 107 L.Ed.2d 267 (1989), *overruled on other grounds by State v. Card,* 121 Idaho 425, 825 P.2d 1081 (1991). However, he erroneously characterizes the three women's testimony as inadmissible hearsay, further arguing that the district court particularly should not have taken judicial notice of the testimony given during offers of proof.

Idaho Code § 19–2515(e) specifically allows the sentencing judge to consider "[e]vidence admitted at trial" and directs the judge that such evidence "need not be repeated at the sentencing hearing." I.C. § 19–2515(e). The Code additionally pro-

788

vides that "[e]vidence offered at trial but not admitted *may* be repeated or amplified if necessary to complete the record." I.C. § 19–2515(e) (emphasis added). Contrary to Porter's argument, the three witnesses' testimony was not hearsay that is analogous to the letter at issue in *Charboneau*, 116 Idaho at 148, 774 P.2d at 318. In *Charboneau*, the letter was hearsay, even at trial, because it was an out-of-court statement offered to prove the truth of the material contained in the letter. *Id.*, 774 P.2d at 318. In the present case, however, the testimony never fell within the definition of hearsay. *See* I.R.E. 801. Thus, we conclude that there was no due process violation.

### B. Alternatives to the Death Penalty

■ Porter argues that he was denied his right to due process at sentencing when the district court allegedly failed to consider alternatives to the death penalty. The district court did not specifically state that it considered alternatives. However, the district court's findings stated that a sentence of death was "the least sentence that would not unduly deprecate the seriousness of the crime in question." Additionally, the record reflects that the district court perceived its sentencing decision as involving the discretion to impose imprisonment, rather than death, because the district court explained in its findings that "Porter ha[d] no capacity for rehabilitation."

■ A district court has discretion to impose the death penalty. *State v. Sivak*, 119 Idaho 320, 321–22, 806 P.2d 413, 414–15 (1990). This Court, therefore, reviews a district court's imposition of a death sentence under the abuse of discretion standard set forth in *Sun Valley Shopping Center*, 119 Idaho at 94, 803 P.2d at 1000. Although this Court has not recognized that a district court specifically must state that it has considered alternatives, this Court reversed a sentence of death in *State v. Leavitt* because "the trial court failed to give adequate consideration of the alternatives which exist between the distant poles of 'rehabilitation and possible probation,' or the death penalty." 116 Idaho 285, 294, 775 P.2d 599, 608, *cert. denied*, 493

U.S. 923, 110 S.Ct. 290, 107 L.Ed.2d 270 (1989).

We believe that the district court in the present case properly, though implicitly, considered alternatives to the death penalty. It clearly addressed the four goals of sentencing, including rehabilitation, and stated that this sentence was "the only way to accomplish justice." Moreover, the district court properly followed the statutory procedure for imposing the death penalty, *see* I.C. § 19–2515, perceived its decision as one involving discretion, and acted within the boundaries of its discretion and consistently with the legal standards applicable to the sentencing choices available. Consequently, we conclude that the district court did not abuse its discretion when it sentenced Porter to death.

### C. Application of the Statutory Aggravating Circumstances

■ When reviewing a district court's findings and analysis of mitigating and aggravating factors, we must review the record of the district court's findings to determine whether the district court met the mandates of I.C. § 19–2515. *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981). We specifically must determine: (1) whether the district court overlooked or ignored any raised mitigating factors; (2) whether the evidence supports the aggravating factors found; and (3) whether the district court properly weighed all of the factors. *Id.* at 415, 631 P.2d at 197. We are not to reweigh the factors. Rather, we are only to determine if there is evidence to support the aggravating factors and whether the weighing process properly was done. *State v. Aragon*, 107 Idaho 358, 366, 690 P.2d 293, 301 (1984).

■ The first inquiry of the *Osborn* analysis requires this Court to determine whether any mitigating factors were overlooked. *See Osborn*, 102 Idaho at 415, 631 P.2d at 197. Porter's defense counsel presented very little mitigation evidence, explaining at the post-conviction relief proceeding that he found it difficult to present mitigation evidence, particularly with respect to remorse, when Porter maintained that he was innocent. Nonetheless, Porter requested that the district court recognize,

as a mitigating factor, that he suffered from a personality disorder with an intermittent explosive disorder. Although the district court considered this factor, the court listed the factor as a nonstatutory aggravating circumstance. In *State v. Leavitt*, 121 Idaho 4, 7, 822 P.2d 523, 526 (1991), *cert. denied*, 506 U.S. 972, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992), this Court affirmed a district court's consideration of a similar factor as a mitigating factor. We do not believe, however, that *Leavitt* mandates that a personality disorder with an intermittent explosive disorder always must be a mitigating factor, nor do we blankly declare that any particular factor always must be either aggravating or mitigating. Rather, the determination of whether a factor is mitigating or aggravating in a specific case is a factual one. *State v. Creech*, 105 Idaho 362, 372, 670 P.2d 463, 473 (1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984) ("the plain language of [I.C. § 19–2515], we hold, requires the judge to list evidence which, in his capacity as a *fact finder*, he has found to be valid, competent, and pertinent to the issue of whether the death penalty should be imposed.") (emphasis added). *See also* I.C. § 19–2515(f) (requiring sentencing judge to make written *findings* regarding any aggravating and/or mitigating circumstances found); I.C. § 19–2515(g) ("Upon making the *prescribed findings*, the court shall impose the sentence within the limits fixed by law") (emphasis added); I.C.R. 33.1(b) ("the trial court shall ... make written *findings* as required by section 19–2515(e), Idaho Code") (emphasis added); *Osborn*, 102 Idaho at 414–415, 631 P.2d at 196–97. Therefore, in reviewing a sentencing court's consideration of a factor as aggravating or mitigating, this Court employs the clearly erroneous standard applicable to factual determinations. *Cf.* I.R.C.P. 52(a) ("Findings of fact shall not be set aside unless clearly erroneous."); *State v. Araiza*, 124 Idaho 82, 87, 856 P.2d 872, 877 (1993) (applying clearly erroneous standard to trial court findings regarding the validity of the prosecutor's explanation for exercising peremptory challenges). We will defer to factual findings made by the lower court if supported by substantial and competent evidence in the record. In this case, a psychiatrist who examined Porter concluded his analysis of Porter's "Atypical Impulse Control Disorder" by stating:

It appears to this examiner that Mr. Porter is able to choose the time and person and place when he will allow his anger to explode. In view of this it would appear to this psychiatrist that his temper outbursts are not uncontrollable but are rather uncontrolled at times of his choosing against people of his choosing. While this is a major social problem and constitutes significant social functional impairment, it does not in the opinion of this examiner result from a defineable illness which would make it impossible for him to control his anger and its attendant behavior.

This psychiatric evaluation constitutes substantial and competent evidence supporting the trial court's finding that Porter's explosive personality disorder was an aggravating, as opposed to a mitigating, circumstance. We conclude, therefore, that the district court did not overlook or ignore any mitigating factors.

■ Porter argues that the district court erroneously found nonstatutory aggravating circumstances that were not supported by the record. At the outset, it should be noted that this Court has determined that a district court properly may find aggravating circumstances not listed under I.C. § 19–2515(h). *See Creech*, 105 Idaho at 369–70, 670 P.2d at 470–71. Porter's contention may be correct, as it is questionable whether the record supports several of the nonstatutory aggravating circumstances that the district court found. However, it is not relevant whether the record supported any of these nonstatutory aggravating circumstances because it does not appear that the district court based its sentencing decision on nonstatutory aggravating circumstances. Therefore, this Court will not review whether the record supports those circumstances. *See id.* at 369, 670 P.2d at 470.

The district court found beyond a reasonable doubt three statutory aggravating factors: (1) the murder was especially heinous, atrocious, or cruel and manifested exceptional depravity; (2) Porter, by prior conduct

and by conduct in the commission of the murder at hand, has exhibited a propensity to commit murder and probably will constitute a continuing threat to society; and (3) the murder in question was committed against a witness or potential witness in a criminal proceeding, because of such proceeding. *See* I.C. § 19–2515(h)(5), (8), and (10) (respectively). In order to comply with *Osborn,* only one of the statutory aggravating circumstances must be found to exist beyond a reasonable doubt. I.C. § 19–2515(h); *State v. Sivak,* 127 Idaho 387, 392, 901 P.2d 494, 499 (1995), *cert. denied,* 516 U.S. 1095, 116 S.Ct. 819, 133 L.Ed.2d 763 (1996).

 With respect to the first factor, we are inclined to agree with the district court that there was evidence to support the finding that Jones' murder was especially heinous, atrocious, or cruel. The autopsy report established that the victim was severely beaten. Although the pathologist testified that the victim may have been knocked unconscious by the initial blow to her head, he also testified that she had numerous bruises on her forearms that appeared to be defensive wounds. According to testimony presented at the trial, the amount of blood found at the murder scene additionally indicates that many of the victim's wounds were inflicted before she actually died. Thus, considerable evidence supports the court's finding that, beyond a reasonable doubt, Jones suffered at the hands of her killer before she died.

 Furthermore, considerable evidence exists to support the district court's finding that Porter has a propensity to commit murder, or the second factor. Despite Porter's argument that he has never committed murder, has never been charged with murder, and has never attempted to murder someone, evidence of his physically abusive tendencies was presented at trial. The testimony appears to demonstrate that Porter, at the time he physically abused his former girlfriends, was not able to control his actions and may have beaten to death any one of them during the course of any of the incidents about which the witnesses testified. Consequently, the evidence supports the second aggravating factor with, at least, some certainty.

 We are not inclined to uphold the district court's finding that the murder was committed against a witness "because of such proceeding." Although it is true that Jones likely would have been a witness at the proceeding regarding the battery charge of December 7, 1988, nothing in the record supports a conclusion that Porter killed Jones because of the pending misdemeanor proceeding. Thus, the record does not support beyond a reasonable doubt the third aggravating factor.

According to the district court's "Findings in Considering the Death Penalty," the court correctly weighed all of the mitigating circumstances against each of the aggravating circumstances. Despite our decision not to uphold the district court's finding that the murder was committed against a witness because of such proceeding, we recognize that the district court correctly found two aggravating factors and properly weighed each against all of the mitigating factors. *See* I.C. § 19–2515(c). Thus, we affirm the sentence.

## IV.

## POST–CONVICTION ISSUES

### A. Refusal To Admit Certain Evidence

 Porter specifically challenges the district court's refusal to admit a mitigation report. The mitigation report contained twenty-three categories of documents, several of which were objectionable on the grounds of lack of foundation, hearsay, competence, and relevance. Although the State offered to address the admissibility of each document individually, the district court refused to admit the entire report.

Porter seems to argue that, because the district court admitted and considered hearsay evidence at the sentencing hearing, it should have admitted hearsay evidence at the post-conviction relief proceeding. Additionally, in a more general sense, he seems to point to the court's evidentiary rulings in an effort to demonstrate that the district court was biased or prejudiced at the post-conviction relief proceeding. Porter's arguments, however, are flawed because he fails to rec-

ognize that the Idaho Rules of Evidence do not govern the admissibility of evidence at a sentencing hearing, and, thus, a sentencing court may consider a wide range of evidence that would not necessarily be admissible at trial. *See* I.R.E. 101(e)(3); *Charboneau,* 116 Idaho at 148–49, 774 P.2d at 318–19.

We believe the district court's ruling was grounded in the applicable evidentiary rules and appears to have been well reasoned. Therefore, we affirm the district court's refusal to admit the mitigation report. Furthermore, because the district court did not err when it refused to admit the mitigation report into evidence, we conclude that Porter has failed to demonstrate that the district court's ruling was based on actual prejudice against Porter. *See Martinez v. State,* 126 Idaho 813, 892 P.2d 488 (Ct.App.1995).

### B. Denial of the Motion for New Trial

Porter filed two motions for new trial. Because the district court did not rule on the first motion for new trial, which was filed February 8, 1990, our review addresses only the district court's denial of Porter's second motion for new trial, which was argued September 2, 1993. *See* I.A.R. 11(c). In Porter's motion for new trial, he contended that the district court should have given the jury a second degree torture murder instruction and argued that this error was sufficient to warrant a new trial.

 Whether to grant a new trial is a discretionary matter for the district court. *State v. Gomez,* 126 Idaho 83, 86, 878 P.2d 782, 785, *cert. denied,* 513 U.S. 1005, 115 S.Ct. 522, 130 L.Ed.2d 427 (1994). Idaho Code § 19–2406 sets forth the only grounds permitting the grant of a new trial and, therefore, limits the instances in which that discretion may be exercised. *State v. Lankford,* 116 Idaho 860, 873, 781 P.2d 197, 210 (1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990). When reviewing a district court's grant or denial of a motion for new trial pursuant to I.C. § 19–2406, this Court will not disturb a district court's discretion, absent a showing of manifest abuse. *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982). An abuse of discretion occurs if one of the three factors set forth in

*Sun Valley Shopping Center,* 119 Idaho at 94, 803 P.2d at 1000, is not met. *State v. Davis,* 127 Idaho 62, 896 P.2d 970 (1995).

The issue of whether the district court should have given an instruction on second degree torture murder was resolved above, in Part II, G, *supra.* Recall that Porter failed to request such an instruction and that the district court did not have an obligation *sua sponte* to give the instruction. *See* I.C. § 19–2132(b). We conclude, therefore, that the district court did not abuse its discretion when it denied Porter's motion for new trial, because we believe the court correctly perceived its decision as one involving the exercise of discretion, reached its decision by an exercise of reason, and applied the correct legal standard, which is found in *Tribe,* 123 Idaho at 726, 852 P.2d at 92.

### V.

### ASSISTANCE OF COUNSEL ISSUES

#### A. Assistance of Counsel at Trial

Porter alleges a number of instances of ineffectiveness of counsel at trial. Although he contends that the Idaho Constitution affords a broader right to effective counsel than the United States Constitution, he has failed to articulate any basis as to why we should apply a different standard in Idaho. Thus, we analyze Porter's allegations in terms of whether the conduct of Porter's counsel fell below an "objective standard of reasonableness," as that test is defined in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

 Under the *Strickland* two-part test, the claimant bears the burden of proving that counsel's performance was deficient. *Strickland,* 466 U.S. at 680, 104 S.Ct. at 2060–61. In this analysis, counsel's effectiveness must be evaluated from the time of the alleged error, not in hindsight. *Id.* at 681, 104 S.Ct. at 2061. The claimant also must prove that the deficient performance prejudiced the claimant's case. *Id.* at 680, 104 S.Ct. at 2060–61. However, prejudice will be presumed if the defendant was denied counsel altogether or if counsel represented conflicting interests. *Id.* at 683, 104 S.Ct. at

2062. Although Porter asserts that he is not required to show prejudice, we have determined that the authority cited in support of his assertion is inapposite. Porter was not denied an opportunity to cross-examine any witnesses, nor was evidence essential to his argument inadvertently destroyed. *See Davis v. Alaska*, 415 U.S. 308, 317–18, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974); *State v. Tucker*, 97 Idaho 4, 12, 539 P.2d 556, 564 (1975). Thus, we conclude that prejudice will not be presumed.

■■■■ Porter points to eight separate alleged deficiencies to support his contention that he received ineffective assistance of counsel, and we will address each of these. When reviewing a defendant's allegation of ineffective assistance of counsel, we will not second-guess trial counsel's strategic and tactical choices. *Aragon v. State*, 114 Idaho 758, 761, 760 P.2d 1174, 1177 (1988). Furthermore, on review, we presume that trial counsel was competent and that trial tactics were based on sound legal strategy. *Id.*, 760 P.2d at 1177.

■■■■ Porter initially contends that his counsel was inexperienced in defending capital cases and had not attended any continuing legal education courses regarding such cases. In *Aragon*, this Court determined that counsel's experience was not dispositive to a claim of ineffective counsel. *Id.*, 760 P.2d at 1177. Rather, a meritorious claim must focus on counsel's performance, as it weighs against an objective standard. *Id.* at 761–62, 760 P.2d at 1177–78. Thus, we conclude that Porter's first claim, on its own, is without merit.

■■■■ Porter next asserts that his counsel failed to request co-counsel in a timely fashion and that this failure falls below a reasonable standard of representation. As discussed in Part II, B, *supra*, the state of Idaho has not recognized a need for the appointment of two defense counsel to a capital case, and we do not believe that defense counsel's failure to satisfy the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases is ineffective per se. In hindsight, we recognize that, in the present case, only one defense attorney may have been overwhelmed by the prosecution's manpower. However, this Court will not resort to hindsight when it reviews a defense attorney's failure to request co-counsel in a timely manner, nor will we accept Porter's invitation to adopt the ABA standard that recommends the appointment of two defense counsel in death penalty cases. *See Strickland*, 466 U.S. at 680, 104 S.Ct. at 2060–61. Thus, we conclude that the failure of Porter's counsel to request co-counsel in a timely fashion was not deficient.

■■■■ Porter contends that his counsel rendered ineffective assistance of counsel when he failed to file a motion for a change of venue. According to Porter's trial counsel, the decision not to file for a change of venue was based on trial strategy, including the difficulty associated with trying a case out of town. Porter's counsel additionally expressed doubt that the district court would have granted the motion. On appeal, this Court will not second-guess trial strategy, and, therefore, we conclude that this claim also fails. *Aragon*, 114 Idaho at 761, 760 P.2d at 1177. *See also Hassett v. State*, 127 Idaho 313, 316, 900 P.2d 221, 224 (Ct.App. 1995).

■■■■ Porter additionally claims that his counsel failed to make discovery requests, alleging that this failure constituted ineffective counsel. We disagree. Although the failure to make discovery requests may rise to the level of inadequate trial preparation and, thus, ineffective assistance of counsel, the claimant must allege what evidence was discoverable that counsel failed to uncover. *Tucker*, 97 Idaho at 12–13, 539 P.2d at 564–65. Porter has not met this burden.

■■■■ Porter asserts that his counsel failed to file a motion to suppress but does not identify the evidence that his counsel should have requested that the district court suppress. Presumably, the evidence that Porter contends should have been suppressed, however, was his guitar case, which had both the victim's blood and strands of Porter's hair on it. Thus, we examine Porter's allegation, as it relates to the failure to suppress the guitar case.

Defense counsel's failure to file a motion to suppress will constitute ineffective counsel if the reviewing court determines that the evidence at issue would have been suppressed. *Carter v. State*, 108 Idaho 788, 795, 702 P.2d 826, 833 (1985). There was a question that Porter's guitar case was seized illegally. The search warrant was issued December 27, 1988, but the executing officers did not seize the guitar case at that time. Three weeks later, at the request of law enforcement officers, Porter's brother took the guitar case to the Idaho County Sheriff's Office. Prior to trial, there was some speculation that Porter's brother had retrieved the guitar case without Porter's permission from a room in which Porter had been residing, but the possibility of an illegal seizure was not explored further.

Although we question the decision of Porter's counsel not to file a motion to suppress, we may not second-guess trial strategy. *Aragon*, 114 Idaho at 761, 760 P.2d at 1177. Porter's trial counsel testified at the post-conviction relief proceeding that Porter had led him to believe that the whereabouts of the guitar case could be explained innocently[2] and, therefore, that he had dismissed the possibility of attempting to suppress the guitar case. Given this explanation, we conclude that Porter's defense counsel's actions simply were trial strategy and, thus, hold that his conduct did not fall below an objective standard of reasonableness.

Porter additionally asserts that his counsel failed to challenge for cause or to assert peremptory challenges to potential jurors. Porter's counsel, however, testified at the post-conviction relief proceeding that, during voir dire of the jury, there was no indication of juror prejudice resulting from media exposure to the case. Therefore, according to Porter's counsel, such challenges were unnecessary, and we will not question that decision.

Porter claims that his counsel also rendered ineffective assistance when he failed to call expert witnesses at trial. In order for this claim to succeed, Porter must assert facts that would have been discovered by additional investigation and should offer expert testimony that would have been produced if the funds to hire the experts had been requested. *Charboneau*, 116 Idaho at 139, 774 P.2d at 309. Porter points to the experts called at the post-conviction relief proceeding to satisfy this burden. Those individuals include a clinical psychologist who testified that hair pulling was common among men who physically abused women; a clinical neuropsychologist who testified that Porter is intellectually deficient;[3] and a forensic pathologist who testified regarding the commonality of hair loss in victims of violent crimes, the errors made during the autopsy of the victim's body, the difficulties presented by the cremation of the body, and the possibility that the victim did not die as a result of torture.

We are somewhat troubled by the fact that Porter's counsel made no attempt at all to employ a pathologist to review the autopsy and to give an independent opinion, especially since the district court had approved funds for an expert witness in pathology. We also have some question about trial counsel's failure to request any kind of psychologist to determine Porter's capabilities, particularly since his IQ apparently is not much better than Cooper's IQ. Nonetheless, we do not believe that this conduct was so deficient as

---

**2.** Porter told his counsel and testified at trial that, on December 11, 1988, he moved his guitar case, as well as some of his other belongings, to his brother's trailer because Porter and Jones had agreed to separate. He further testified that Jones' nose bled after she had gone to bed on the evenings of December 9 and 10, 1988, and that Jones had walked by the guitar case on her way to the bathroom to tend to her nosebleeds on both occasions. Porter's story was not inconsistent with either the testimony of the deputy who evicted Porter from Jones' residence or the fact that Porter's guitar case ultimately was found at Porter's brother's trailer. Therefore, Porter's counsel had no reason to question Porter's explanation regarding the whereabouts of the guitar case.

**3.** At trial, the State presented expert testimony that tended to indicate that Dale Cooper could not have committed the murder because he lacked the intellectual capacity. This psychologist's testimony placed Porter and Dale Cooper in roughly the same IQ range. Thus, the testimony could have been beneficial to the defense.

to fall below an objective standard of reasonableness.

▮ Porter additionally asserts that his trial counsel failed to prepare adequately. To succeed, this claim must be supported by evidence of facts or defenses that could have been developed with further preparation. *Id.*, 774 P.2d at 309. We do not believe that Porter has met his burden. Furthermore, based upon our findings regarding Porter's other allegations, we conclude that his counsel's performance was reasonable and, therefore, that his counsel's preparation was adequate.

We are not prepared to conclude that Porter's counsel at trial was stellar. However, we believe that Porter has failed to overcome the presumption announced in *Aragon* that trial counsel's performance was competent and that trial tactics were based on sound legal strategy. *Aragon,* 114 Idaho at 761, 760 P.2d at 1177. Consequently, we do not believe that, overall, the performance of Porter's trial counsel fell below an objective standard of reasonableness.

## B. Assistance of Counsel at Sentencing

▮ Porter points to only two alleged deficiencies at the sentencing phase. On review, we apply the same standards to a claim of ineffective assistance of counsel at sentencing as we applied above to Porter's claim of ineffective assistance of counsel at trial. *See Strickland,* 466 U.S. at 668, 104 S.Ct. at 2052; *Aragon,* 114 Idaho at 758, 760 P.2d at 1174.

▮ Porter contends that his counsel rendered ineffective assistance of counsel by failing to file a motion in limine regarding statements Porter might make during the interview that would be conducted pursuant to preparation of the presentence investigation report. Initially, we note that the failure to file a motion is considered deficient performance by counsel if there were a reasonable probability that the motion would have been meritorious. *Hassett,* 127 Idaho at 316, 900 P.2d at 224. Given that the sentencing court orders a presentence investigation report and that sentencing hearings are governed by extremely lenient evidentia-

ry rules, *see* I.R.E. 101(e)(3), we do not believe that a motion to exclude evidence from a presentence investigation report would have been granted. Furthermore, Porter's counsel testified at the post-conviction relief proceeding that, because Porter maintained innocence, there was no need to be concerned that Porter would tell the presentence investigator anything different than Porter had revealed while testifying at trial. Thus, Porter's claim does not satisfy the standards set forth in *Strickland* and *Aragon.*

▮ Porter also claims that his counsel's preparation for the sentencing hearing was deficient because his counsel failed to present mitigation evidence. We recognize that a situation such as this presents defense counsel with a dilemma. When a defendant maintains innocence, it is exceptionally difficult for defense counsel to present evidence demonstrating remorse or explaining why the defendant committed the crime. Faced with this problem, Porter's counsel presented only basic background information, including evidence that Porter was verbally and physically abused by an alcoholic father. Nonetheless, Porter claims that a mitigation report similar to the one that the district court properly excluded at the sentencing hearing could have convinced the sentencing court to impose a sentence less severe than death. We disagree.

We have indicated that we will not second-guess defense counsel's decisions, and we believe this principle properly applies to the present issue. *See Aragon,* 114 Idaho at 761, 760 P.2d at 1177. Although the mitigation report contained additional psychological evaluations of Porter, it also contained many documents that were irrelevant and, moreover, inadmissible. Consequently, we conclude that Porter has failed to satisfy his burden of demonstrating that his counsel was deficient in not producing the additional allegedly mitigating evidence.

## VI.

### CONSTITUTIONAL ISSUES

#### A. Idaho Code § 18–4003

▮ On appeal, Porter challenges the constitutionality of I.C. § 18–4003, arguing

that the statute is vague, overbroad, and ambiguous, as applied, because the terms "sadistic inclination," "torture," and "intent to cause suffering" lack sufficient definition to give notice regarding the proscribed conduct. However, Porter provided no argument or authority in his brief to support his contentions and simply requested leave to address the issue in oral argument. Because this Court, on appeal, does not address issues that are completely without support, argument, or authority, this Court will not address Porter's contention that I.C. § 18–4003 is unconstitutional. *City of Sun Valley v. Sun Valley Co.*, 128 Idaho 219, 912 P.2d 106 (1996).

**B. The Right To Confront and Test Evidence at the Sentencing Hearing**

██ Porter alleges that Idaho's capital punishment scheme deprives defendants of rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Section 13 of the Idaho Constitution because the scheme precludes defendants from confronting witnesses at the sentencing proceeding. Porter, however, provided no authority in support of his contention and failed to argue why this Court should overrule prior cases that found the statutory scheme constitutional. Therefore, we uphold *State v. Hoffman*, 123 Idaho 638, 646–47, 851 P.2d 934, 942–43 (1993), *cert. denied*, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994), and *Charboneau*, 116 Idaho at 145–47, 774 P.2d at 315–17, both of which recognize the constitutionality of allowing the district court to rely on a wider range of evidence during the sentencing phase of a trial than the adjudication phase.

**C. Shifting the Burden of Proof to the Defendant**

██ Porter asserts that Idaho's capital punishment scheme violates defendants' rights to due process and equal protection, as guaranteed by the United States and Idaho Constitutions, but argues only that the statutory scheme results in cruel and unusual punishment in violation of the federal and state constitutions. Nonetheless, this Court

has addressed claims similar to those raised by Porter and has found that Idaho's capital punishment scheme violates neither the United States nor the Idaho Constitution. In *Osborn* and its progeny, this Court concluded that the sentencing process does not unconstitutionally shift the burden of proof to the defendant. We reasoned that the weighing process is concerned primarily with presenting relevant information to the sentencing court so that it can reach a reasoned and considered decision. *Osborn*, 102 Idaho at 416–17, 631 P.2d at 198–99. *See also Pizzuto*, 119 Idaho at 772, 810 P.2d at 710 (determining that I.C. § 19–2515 does not violate the Eighth Amendment to the U.S. Constitution or Article I, § 6 of the Idaho Constitution); *Creech*, 105 Idaho at 370, 670 P.2d at 471 (concluding that the language of the statutory scheme is sufficiently narrow to avoid an arbitrary and capricious infliction of the death penalty). We, therefore, follow the previous decisions of this Court and conclude that Idaho's capital punishment scheme does not unconstitutionally shift the burden of proof to the defendant.

**D. The Right to a Jury at Sentencing**

Porter asserts that Idaho's capital punishment scheme violates the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 7 and 13 of the Idaho Constitution because the sentencing scheme allegedly deprives him of a jury determination of aggravating circumstances. However, he argues only that the statutory scheme violates his rights to due process under the United States and Idaho Constitutions and that it results in cruel and unusual punishment, as proscribed by the federal and state constitutions. The United States Supreme Court has concluded definitively that the federal constitution does not require a jury determination of aggravating circumstances. *Spaziano v. Florida*, 468 U.S. 447, 460, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984). Additionally, this Court consistently has rejected arguments similar to Porter's and has upheld judicial determination of aggravating circumstances, as consistent with the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article I, Section 7 of the Idaho Consti-

tution. *Charboneau*, 116 Idaho at 145–47, 774 P.2d at 315–17. *See also Hoffman*, 123 Idaho at 643, 851 P.2d at 939; *State v. Pizzuto*, 119 Idaho at 769, 810 P.2d at 707; *State v. Paz*, 118 Idaho 542, 552–53, 798 P.2d 1, 11–12 (1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2911, 115 L.Ed.2d 1074 (1991), *overruled on other grounds by State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991).

## VII.

### AUTOMATIC SENTENCE REVIEW UNDER I.C. § 19–2827

This Court is obligated by statute to review the record of the trial and the sentencing hearing in light of the requirements of I.C. § 19–2827(c). I.C. § 19–2827; *State v. Wells*, 124 Idaho 836, 837, 864 P.2d 1123, 1124 (1993). Idaho Code § 19–2827(c) requires that this Court review all death sentences and that we specifically determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether the evidence supports the judge's finding of a statutory aggravating circumstance from among those enumerated in section 19–2515, Idaho Code, and

(3) Whether the sentence of death is excessive.

I.C. § 19–2827(c).

■ As to the first element of the inquiry, we believe that the findings of the district court during the sentencing hearing reflect a rational and dispassionate evaluation of the case. The district court's rulings are grounded in a thorough understanding of all of the relevant evidence presented to it. Additionally, though several errors arguably may have been made, there is nothing in the record that seems to indicate that those errors were the result of passion, prejudice, or arbitrariness. Thus, there is no reason to believe that the death penalty was imposed as a result of passion, prejudice, or arbitrariness.

As to the second element of the inquiry, we held above that the record supports the district court's finding of two statutory aggravating circumstances. *See* Part III, C, *supra.*

■ Finally, as to the third element of the inquiry, the Idaho Legislature amended I.C. § 19–2827(c)(3) in 1994, rendering the term "excessive" meaningless. *See Sivak*, 127 Idaho at 393, 901 P.2d at 500. Consequently, we decline to undertake any consideration of the "excessiveness" of Porter's sentence, beyond an independent review to determine whether the district court's finding and weighing of aggravating and mitigating factors is supported by the record. Our analysis of this is set forth in Part III, C, *supra.*

## VIII.

### CONCLUSION

For the reasons stated above, we affirm the conviction and the sentence of death.

JOHNSON, SILAK and SCHROEDER, JJ., concur.

McDEVITT, J., concurs in result.